GEORGE MINCKE, Respondent, v. JOHN W. SKINNER, Appellant.

1. *Land Titles — Conveyances — Description of property — Construction.*— Two tracts of land, conveyed to different grantees by the same grantor, lay upon opposite sides of a pond, through which a creek flowed at the time of making the deeds. Both of the deeds describing the separate tracts of land gave the boundary line dividing them as "the middle of the natural channel of the creek when the pond is exhausted." These deeds also reserved the right of keeping up the dam and the flow of water in the pond forever. The water in the pond was drawn off or exhausted about eighteen or nineteen years after the deeds were made. *Held,* that the phrase "the middle of the natural channel of the creek when the pond is exhausted" meant the position of the thread of the creek at the time when the pond was actually exhausted. If the phrase "when the pond is exhausted" had been left out, the deeds would have provided for a shifting boundary, changing with the gradual changes of the stream, until the owners, by the withdrawal of the pond, could take possession of the bed and confine the stream. That phrase only fixes the time when this uncertain boundary should become certain, and fixes it at the precise time when the parties should be enabled to take possession. (Primm *et al.* v. Walker, 38 Mo. 94, cited and affirmed.)

2. *Evidence — Surveys, unofficial — Competency.*—A plat of land made by a surveyor, although not a record nor official in its character, when accompanied by the testimony of the surveyor who made the survey, and who testifies to its correctness, may properly be exhibited to the jury as a part of such testimony, and the accuracy of the plat may properly be left to the jury. It is not necessary that one who makes surveys should be a county or government surveyor to enable him to testify to his surveys or the correctness of any plat of them.

3. *Evidence — Depositions—Admissibility.*—A paper, purporting to be a depo-
sition, which does not show in what cause it was taken, or whether with or
without notice, or who was present examining and cross-examining, and was
not filed in any particular cause, has none of the elements of a deposition,
and should be rejected if offered in evidence.

## *Appeal from St. Louis Circuit Court.*

The facts of the case sufficiently appear in the opinion of the
court.

*Isaac T. Wise*, for appellant.

The court below erred: (I.) In granting the instruction given
for plaintiff: 1. It calls for the location of the channel when
the pond was exhausted, and then only. 2. It fixes on the year
1851 as the only time when the boundary channel could be ascer-
tained, and makes the survey at that time conclusive as to its
location. 3. It makes a survey, not made by a county or United
States surveyor, legal evidence. (II.) In rejecting the deposi-
tion of Brown.

(I.) 1. One error manifest in the instruction given for the
plaintiff is that it treats the exhaustion of the pond as a fact
necessary to be found before the channel could become a boundary.
The words used in the report and deeds, viz: "The middle of
the natural channel of the creek in its natural bed, when the pond
is exhausted," are purely and simply, every one of them, words
limiting and defining the boundary, and nothing more. Those
words are used in the report of the commissioners about thirty
times in bounding about twenty lots. In all, the words "when,"
etc., are used in connection with words describing the boundary.
The other boundary terms are purely and simply, every one of
them, words limiting and defining the boundary. The presump-
tion is strong that the men engaged in this most important work
knew what they were about, and that, if they could, they would
establish a boundary that would be certain to a certain intent, in
every particular. The report shows that they knew where the
channel was, and that they intended the boundary line of lots
bordering on the pond to be the line of the lowest ground over
which the creek ran before the dam was built, and over which it

would naturally flow when unobstructed. With this idea in view—viz., that the line of the lowest ground in the bed of the bare creek was to be the boundary — every word will be seen to be apt, fit, appropriate, and indispensable. 2. The boundary thus defined existed in 1832. The words appear to establish a present boundary. If by "when," etc., it was meant to limit the boundary line to the lowest part of the creek, or, what is the same, to the deepest water of the pond, then the boundary existed in 1832 as much as in 1851 or 1856. If that boundary existed in 1832, the limits and bounds of lots were then accurately and actually fixed and determined at that time and from that time. It was not necessary to have the pond exhausted of water in order to find the boundary. If the boundary was on the line of the deepest water, it was ascertained by measurement, or could be established by witnesses who had seen the channel when the bed of the channel was wholly or in part bare. It is not required by the deeds. On the contrary, the deeds require that the pond shall not be exhausted. It is provided in the very deed to Newman on the record (as in the report) that the pond never should be exhausted, but should be kept up forever to its present hight, for the benefit of the owners of the mill. When parties seek to establish the proposition that an exhaustion is necessary, they should show some direct injunction or authority for it.

2. The court erred in fixing on the year 1851 as the only one in which the boundary channel could be found. If the boundary depends on the time of the exhaustion, then this was a fact to be left to the jury, and not a fact to be ascertained by the court. By selecting this year the court excluded all other times, before or after, from the jury. *Expressio unius exclusio alterius.* By directing special attention to the channel found in this year, they take from the jury the consideration of any other. The court settles the whole matter, decides that it is the true channel, that there is no objection to it, and no proof of any other. We further object to the action of the court in making the channel of 1851 the boundary, inasmuch as, if the creek was in 1851 a natural stream, in its natural bed, it could not be a fixed boundary — that is, unchangeable. A natural stream is a shifting

boundary. "It is by its very nature," Judge Holmes says, "a shifting, not a fixed, landmark." (Primm v. Walker, 38 Mo. 94.) If so, the boundary of 1851 would not do for any subsequent time.

*T. T. Gantt*, for respondent.

Bliss, Judge, delivered the opinion of the court.

This was an action for the possession of a parcel of land situate upon Tayon avenue, in the city of St. Louis, being a part of " Chouteau mill tract," so called. The plaintiff shows a chain of title to lot 20 of the tract, as apportioned among the heirs of Chouteau, of which he claims the land in controversy to be a part, and the defendant shows title through the same channel to lot 3 ; and the question is whether the land claimed by the plaintiff belongs to lot 20 or to lot 3. These lots are on opposite sides of, and are separated by, Chouteau's mill pond. The commissioners of partition, in 1832, deeded to plaintiff's grantor said lot 20 by the following description: "Beginning at the intersection of a street eighty feet wide (Tayon avenue) with Chouteau avenue; thence along the east line of said street north 14° 15′ east to the middle of the natural channel of the creek when the pond is exhausted; then continue down the creek along the middle of its channel to the intersection of the line between lots 19 and 20; thence along said line to Chouteau avenue, and thence along said avenue five chains to the.beginning." The description of the creek line in defendant's deed is substantially the same: " run to the margin of the pond and continue the same course, which is north 75° 15′ west to the middle of the creek in its natural channel when the pond is exhausted, be the said distance more or less; thence with the middle of the channel of the creek as aforesaid to a point," etc. The " middle of the natural channel of the creek when the pond is exhausted" is the boundary dividing line of the parties, and the dispute arises in the interpretation of the words — the plaintiff claiming that they refer to the situation of the channel as ascertained when the pond was actually drawn off or exhausted in 1851, and the defendant that

it refers to the lowest part of the pond at the date of the deed, or to what would have been the natural channel of the creek had it then been exhausted.

The plaintiff, upon the trial, exhibited the plat of a survey of the channel immediately after the pond was drawn off, accompanied by the testimony of the surveyors as to its accuracy, which survey placed the disputed land in lot 20 ; and the defendant undertook to show by a number of witnesses that at the date of the deeds, and for some time after, the channel or deepest part of the pond was west of where it was ascertained to be when drawn off, and so far west as to include in lot 3 the land in dispute. · The view taken by the Circuit Court of this matter appears from the following charge to the jury, given at the instance of the plaintiff, to which defendant excepted:.

" 2. The position of the thread of the channel of the creek of Chouteau's pond in its natural bed when the pond is exhausted is the fact which will determine the boundary between the land of the plaintiff and that of the owner of the opposite land ; and if the jury find from the evidence that the pond was exhausted in 1851, and that thereupon the plaintiff caused the thread of the channel of the creek in its natural bed to be surveyed, and the position of that thread of the channel is correctly shown by the plat of survey of Shultz, Hyer & Cozzens, given in evidence, and that Tayon avenue is the western boundary of the tract of land sold to plaintiff by Newman, and that the deeds and documents read in evidence by plaintiff are genuine and authentic, and that the defendant was in possession of the land described in the petition at the commencement of the suit, they will find the defendant guilty of the trespass and ejectment in the petition alleged."

The survey of the thread of the channel referred to was the one made after the pond was drawn off in 1851 ; hence the whole merits of the controversy are involved in this instruction. Does the phraseology of the deeds confine the parties to the boundary to be ascertained at some future time, when the pond shall be exhausted, or is such boundary located at the date of the deed? These commissioners of partition executed a large number of deeds of land bounded by this pond, and in this respect the

phraseology of all was the same. Was it their intention to describe a present location of this boundary, as by planting a monument or calling for an existing landmark, or to provide a clear and certain mode of ascertaining it when the pond should be no longer in use?

These deeds reserved the right to keep up the dam and the flow of water in the pond forever, so that the position of the channel would be of no practical importance until the mill was abandoned. Possession of the land so flowed could not be taken until then, and it would seem quite natural to so provide for ascertaining the boundary at that time. The proceedings of the commissioners seem to have been had with great care and circumspection; and had it been their intention to make a present fixed boundary, it could easily have been done by running an imaginary line through the pond, laying it down upon their map, and making their deeds conform to it, or by temporarily drawing down the pond and ascertaining and measuring the channel as it then was.

Had the deeds made the boundary "the middle of the natural channel of the creek," leaving out the limitation "when the pond is exhausted," they would have provided for only a shifting boundary, changing with the gradual changes of the stream. It might have been near one bank at the date of the deed, and by such changes gradually approach the other; and it would continue to change until the owners, by the withdrawal of the pond, could take possession of its bed and confine the stream. This limitation is, then, no hardship to any one. It only fixes the time when this uncertain boundary shall become certain, and fixes it at the precise time when the parties shall be enabled to take possession. That it does so fix the time seems clear. "To the middle of the natural channel of the creek when the pond is exhausted" must mean to the middle, etc., at the time the pond is exhausted, otherwise the phrase "when," etc., has no meaning. This question was considered in reference to these very deeds in Primm *et al.* v. Walker, 38 Mo. 94, and the court then held that the thread of the channel did not become a fixed boundary until the pond was exhausted. Any other holding would unsettle the boundaries of a large amount of valuable property belonging to these parties

and to others, and render it impossible to establish them except by conjecture. It is probable that the deepest part of the pond between the lands of the parties to this suit was further west when the deeds were made than when the pond was exhausted, but precisely where it is impossible to tell. After long litigation, and listening to the opinions of those accustomed to bathe and fish in the pond, with no actual soundings and charts to guide them, juries would be compelled at last to fix some arbitrary line where they might conjecture the deepest part of the pond to have been, and it would be fortunate if they could all so reconcile their conjectures as to fix any line at all. It is more than probable that they would find themselves compelled to adopt the channel of the stream when the pond was drawn off as the best evidence attainable of what had always been the channel.

The defendant objected, upon the trial, to the exhibition to the jury of the plat of the survey of Shultz, Hyer & Cozzens, for the reason that it was not official in its character. This plat was not offered as a record, or as proof in itself, but was accompanied by the testimony of the surveyor who made the survey, and who testified to its correctness. It is not necessary that one who makes surveys should be a county or government surveyor, to enable him to testify in reference to his surveys or to the correctness of any plat of them. The accuracy of the plat was properly left to the jury.

Defendant offered in evidence a paper purporting to be a deposition of one Brown, and proved his death, which was rejected by the court. The paper had none of the elements of a deposition. It does not appear in what cause it was taken, or whether with or without notice, or who was present examining and cross-examining, and was not filed in this cause or any other. It was properly rejected. Some other matters are presented in the brief of defendant, but are not so raised upon the record that we can consider them. The record shows an attempt to prove that the channel of the creek was thrown eastward by work upon Tayon avenue and Clark avenue. Had it appeared that this channel was changed by such work, or by any other artificial means, before its position was fixed by the survey, it then would not have been

the boundary, for it would not be "the natural channel of the creek." But the evidence all shows that no work was done upon these streets that could have had this effect until 1852, the year after the pond was "exhausted" and the channel of the creek established by survey.

The judgment of the Circuit Court is affirmed. Judge Wagner concurs. Judge Currier not sitting.