## HEARNE *v*. STATE.

### Opinion delivered December 20, 1915.

1. CRIMINAL LAW—JOINT INDICTMENTS—NUMBER OF PEREMPTORY CHALLENGES.—Appellant, although jointly indicted for homicide with other defendants, has the right, upon request, to a separate trial, in which event he individually would have been permitted to exercise the right to twenty peremptory challenges, in selecting a jury; but not having asked to sever, and having consented to a joint trial, the defense only has the right to exercise twenty challenges without regard to the number of persons on trial as defendants.

2. EVIDENCE—COPY OF MAP—BOUNDARIES.—A witness may testify as to the boundary of an island from the copy of a map produced by him in evidence, where witness stated that he formerly made a survey of the island to determine the boundary line, and had made a map thereof, and that the copy of the map introduced in evidence and referred to in his testimony was a photographic copy of the original map made by him, and which had been compared, and was known by him to be correct.

3. EVIDENCE—EXCLAMATIONS—RES GESTAE.—In a prosecution for homicide, evidence of exclamations made by persons near the accused, calling accused's name, held admissible as part of the *res gestae*.

4. CRIMINAL LAW—VENUE—ISLAND—BOUNDARY—RIGHT TO OBJECT.—Defendant was indicted for murder committed on Island No. 37 in the Mississippi River, between Mississippi County, Arkansas, and Tipton County, Tennessee. On the issue of venue the court instructed the jury that the boundary line between the two states was "the middle of the main channel of the Mississippi River as the same existed on the 16th day of June, 1836, * * *" *Held*, the instruction was correct, and the Supreme Court of Tennessee,

having recognized the boundary to be as declared by this court, that the defendant could not complain of said instruction.

5. CRIMINAL LAW—CONSPIRACY—PROOF.—Where appellant, with others, was charged with murder, *held*, the conduct of appellant, and the others in charge of the place when the shooting took place, together with the threats and statements shown to have been made by them, sufficient to show an unlawful conspiracy to resist the officers, and to kill the sheriff upon an attempt to arrest them.

6. CRIMINAL LAW—PROOF OF CONSPIRACY.—Where a criminal conspiracy is sought to be proved, the jury should be permitted to have before them all the facts which will enable them to come to a correct conclusion; and the trial court has a large discretion in the admission of testimony, and if all the evidence shows that a conspiracy actually existed, it is not material whether the conspiracy is established before or after the detailing in evidence of the acts and declarations of the conspirators.

7. RESISTING ARREST—SUFFICIENCY OF EVIDENCE.—In a prosecution for homicide, the evidence held to show that one B. knew when he fired upon deceased, that he was resisting an arrest by officers of the law and was not attempting to defend himself from the deadly assault of an unknown assailant.

Appeal from Mississippi Circuit Court; *W. J. Driver,* Judge; affirmed.

STATEMENT BY THE COURT.

Sam Mauldin, the sheriff of Mississippi County was shot to death in the early morning on July 30, 1915, while raiding the joint owned by Andy Crum, on Island No. 37, in the Mississippi river, for the purpose of arresting certain offenders for whom he held warrants.

Andy Crum, a white man owned the place, which was conducted for the patronage of negroes principally and consisted of a gambling house operated by Burt Spring, a negro, a saloon or blind tiger of which Dave Hearne, appellant, was in charge—and a "honky-tonk."

When Crum was away, as he generally was, Mr. Moore was in charge, and in his absence Dave Hearne was in control.

The officer and his posse surrounded the place on this morning and Doug Chapman, and an officer of the militia, went to the front of the gambling house where Burt Spring was seen with the door partly opened and

his head out, apparently having been disturbed and trying to ascertain the cause of it. Chapman drew his gun and said "come out with your hands up." Spring immediately dodged back and closed the door and Chapman shot at him and shot again as the door was closed and Spring commenced to shoot and a woman and probably Spring began to holloa, "Oh, Mr. Dave, Mr. Dave!" Chapman or the militia officer then put forward Piggy Lewis, a negro, to force the door and the shooting continued and Lewis called to Spring as he was trying to break the door in, "Don't shoot these white folks and officers and soldiers, don't you make fire or you are a ruined man." The door was forced open and the shooting continued and the sheriff who had come round by this time towards the door, upon a shot being fired from within the house, returned the shot, and another shot was fired from within, which struck him and after shooting again he retired fifteen or twenty feet under the arbor and laid down across a crap table, saying, "Curt, he has killed me."

Dave Hearne opened the door of his room after the shooting began and started out in his night clothes when one of the posse presented a double barrel shot gun and arrested him. He had no weapon in his hand when he came out, but two or three pistols, a couple of shot guns and a rifle all loaded were found in his room within easy reach of his bed. When the dying sheriff was brought up to where he stood, he laughed and the officers had trouble in preventing violence to him from some members of the posse. Burt Spring was killed in the raid and the houses all burned.

Several witnesses testified about conversations and statements made by Andy Crum, the owner, and those in charge of the place, relative to what should be done in resisting the Arkansas officers if they attempted to arrest them for violation of the law and take them from the island.

A witness testified that he had heard Cham Moore, Andy Crum and Burt Spring often in front of the saloon talking and saying that they were not going to be arrested

if the officers came after them, that Dave Hearne was where he could hear these remarks and had said that he did not intend going. This witness slept one night in the room with Dave Hearne, at his request, and said when he laid down upon his pallet "Mr. Hearne told me that I had better take the pump gun or the Winchester over there with me and also that if anybody happened to knock on the door to wake him up before I opened the door or started to shooting and he also told me 'that if there ain't but one or two we ain't going no how.'" This was a month or six weeks before the officers made the raid. He also stated Burt Spring ran the gambling department and had said he did not intend going to Arkansas and that Mr. Hearne told me if I went before the grand jury that I had better not tell that he had anything to do with selling whiskey. "Mr. Hearne sold whiskey over there."

"When Mr. Moore was away, Mr. Dave Hearne was boss and Mr. Moore left on Monday or Tuesday before the raid." This witness had heard the proprietors and employees talking frequently after the question of the jurisdiction began to be discussed. Said the day they were looking for the officers, that he had heard Crum give orders when he was there, about shooting the officers if they came. In his absence Cham Moore gave orders, Cham said to stay with Mr. Dave.

"Q. Was he talking about Dave Hearne?"

"A. Yes, sir. He said nobody would know what happened, stay with Mr. Dave and when Mr. Dave was there he would give orders too. Mr. Dave would give orders just the same as the rest of them would about the officers. He would tell us to stay with him, if anything happened not to leave him or anything like that."

Silas Taylor testified that he had heard Crum talk about the proposed raid by the Arkansas officers and that he meant to kill them if they came to raid his place and that Burt Spring agreed with him and said he would fight and help to kill him. Burt said he was not going to be arrested.

Several witnesses stated that Andy Crum said he was not going to be arrested by Arkansas officers.

Cham Moore stated that it would take more than four or five men to arrest him, that if he was arrested, the militia would have to do it.

Dave Hearne stated that it would take more than one man to arrest him, that no one man could do it.

Another witness stated that he saw Dave Hearne with a pistol on his shoulder in a scabbard and two behind the counter. At this time he had gone in to buy some beer and when the boy started out with it, he was asked "who is it for" and replied "For the sheriff out here." He reached over and caught the bottles by the neck and the boy said, "They are Tennessee men over here," and he said, "All right, then."

Dillahunty testified that he had gone into the place for a bottle of beer and Andy Crum and a negro were there and the negro waited on him and after drinking a bottle he stood a few minutes and asked Crum to have a bottle with him and Crum took his hand off of the gun and drank beer with him. "While I was there I think it was a little while after the raid had been made on 34 here, and I got to kinder' joking him and told him first and last they were going to come over and get him and he remarked there were not enough officers to take him off the island, there was not enough officers could get on the island to take him off."

Archie Holt testified that he had a conversation with Dave Hearne in Andy Crum's place about the officers in which Dave said "What it would take to keep the officers from taking him, he happened to have," at the time throwing back his coat and showing a big pistol. Several witnesses for the defendant including officials and former officials of Tipton County, Tenn. testified that Island No. 37 had always been considered in Tennessee, that jurors had been summoned from there, process of the court executed on the island by the sheriff, the taxes paid to the officials of Tipton County and marriages performed by the officials of that county and justices of the peace elected, and that it had always been considered Tennessee territory. Some of the older witnesses stated that since their earliest recollection, Tennessee had exercised

exclusive jurisdiction over the island, and that they had never heard of any claim of jurisdiction thereof by the State of Arkansas.

Jno. Lovewell, ex-sheriff of Mississippi County, who had also been constable and assessor, said he was acquainted with Island No. 37 in the Mississippi river and never undertook, as constable, assessor or sheriff of Arkansas, to exercise any jurisdiction over any portion of it, for the reason that it was conceded to be in the State of Tennessee; that no part of the island was ever assessed for taxes by Mississippi County in the State of Arkansas while he was in office.

Several civil engineers testified, one or two of whom had made maps of the island and J. A. Green, introduced a photographic copy of an original map made by him and stated that he had established the State line across the island between the Arkansas and Tennessee shore; that he located the original center of the Mississippi river and found that about twenty acres of the Osborne land was in Tennessee, that the proper officials of Tennessee took possession of that and did not take possession of that part of the tract on the Arkansas side. That the Tennessee portion was unimproved.

The Crum place was shown by several witnesses, civil engineers among the number, to be 164 feet within section 23, township 10 north, range 9 east, Mississippi County, Ark. Dwight Morris who made this statement said the plat had been made from government notes.

Curtis Little testified he was clerk of the court of Mississippi County and had been county surveyor for six years and that surveying had been his business for fifteen years. That he made a survey of the island from notes from the plat or photographic copy of the original surveys furnished by the land commissioner's office at Washington, the book having attached to it, the certificate of the surveyor general. He also stated that some of the records of the county showed that the fractional northeast quarter and the fractional northwest quarter of said section had been assessed for taxes in Mississippi County; that the Arkansas part of the northeast quarter

was fifty-seven acres and that the Andy Crum joint was on this quarter and included in the fifty-seven acres. This is in Mississippi County. This witness was with sheriff Mauldin, the night of the raid and said we were expecting trouble. I was assigned to the "honky-tonk." In going there Mr. Chapman and Blackwood ran to the front of the "honky-tonk," the east side, and a woman inside screamed. Chapman ordered Piggy Butler to push the door open and when he went there to do so shots would come from the inside.

The court instructed the jury refusing to give a great number of instructions requested for appellant and from the judgment upon the verdict of guilty, he prosecutes this appeal.

*John A. Tipton, Clarence P. Boals* and *L. C. Going,* for appellants.

1. It was error to refuse to permit defendant to challenge the juror, Owens, as his challenges were exhausted.

2. Secondary evidence was admitted upon the trial. The original papers or certified copies were the best evidence.

3. Hearsay evidence is not admissible.

4. The court erred in its instructions. Long acquiescence by one State in the possession of territory by another and in the exercise of sovereignty and dominion over it, is conclusive of title and authority. 136 U. S. 479; Vattel on Law of Nations, book 2, Ch. 11, § 149; 148 U. S. 524; Wharton on Int. Law, part 2, Ch. 4, § 164; 37 U. S. 657. If the killing was justifiable defendant could not be guilty as accessory. Where the evidence is conflicting, it is for the jury to determine whom they will believe. The instructions asked by defendant were not covered by those given. The venue was in Tennessee. 148 U. S. 524. Defendant was granted too *speedy* a trial, of the *shot gun* variety. Every rule of law and procedure was violated.

*Wallace Davis,* Attorney General, and *Jno. P. Streepey,* Assistant, for appellee.

1. The court did not err in refusing to permit the challenge of the juror, Owens. 10 L. R. A. 323; 1 Parker Cr. Rep. 595; 77 C. C. A. 432; 112 Iowa 458; 69 N. J. Law 522; 77 Ark. 74; 117 Ark. 71.

2. Green's and Little's testimony was competent and properly admitted. Neither the correctness nor the accuracy of the map, nor field notes was attacked. A diagram may be used as part of the testimony. 103 Ark. 28; 93 *Id.* 313. Certified copies of surveys and official maps and photograps are admissible in evidence. 97 Ark. 92; 79 N. W. 479; 44 Mo. 92; 50 Ala. 91.

No hearsay evidence was admitted. The statements were part of the *res gestae.* Wigmore on Ev. 1755-1790; 61 Ark. 590; 85 *Id.* 479; Wharton on Ev. 258, 267; 11 Enc. Ev. 316. In proof of a conspiracy great latitude is allowed. 130 Ind. 467; 107 Fed. 753. Much is left to the discretion of the trial court. 163 Mass. 411; 159 U. S. 590; 77 Ark. 444. Where it is shown that a conspiracy existed, it is immaterial whether it existed before or after the detailing of the acts and declarations of the co-conspirators. 122 Ill. 337; 181 Md. 173; 157 Ind. 57; 87 Ark. 34; 81 *Id.* 73. It is only necessary to show concerted action, (77 Ark. 444); that their acts were connected. 98 Ark. 575; 105 *Id.* 75. The statement of a co-conspirator is admissible. 96 Ark. 629; 132 S. W. 924. Any act done or declaration made by one of two conspirators, though in the absence of the other, may be shown. 98 Ark. 581.

When a *prima facie* case of conspiracy is established, the statements of either or all of the co-conspirators, are competent evidence. 96 Ark. 631; 59 *Id.* 430; Wharton Cr. Ev., § 698.

KIRBY, J., (after stating the facts). Appellant's first contention for reversal is that the court erred in denying his right to peremptorily challenge one of the jurors offered after the twenty peremptory challenges allowed by law had already been exercised by the defendants in the case in which he was jointly tried.

It is argued that appellant did not exercise his right of challenge at all, was not consulted and did not participate therein, the right being given to Bob Kenton, whom

the record shows challenged the twenty jurors. Under our statute, the defendant is entitled to twenty peremptory challenges in prosecutions for felony and it is not claimed that the twenty challenges were not exercised and the right exhausted in this case but that each defendant where they were tried jointly, is entitled to the designated number of peremptory challenges. The law allowing three peremptory challenges of jurors to the parties in civil actions has been construed and held to mean that each side is only entitled to that number, without regard to the number of plaintiffs or defendants interested in the trial; that the challenge of a juror on behalf of the plaintiff or defendant is a challenge for all on that side, regardless of number and this is likewise true when cases are consolidated and tried together. *Fidelity Phenix Ins. Co.* v. *Friedman,* 174 S. W. 215, 117 Ark. 71.

(1) Appellant was jointly indicted with the others and had the right upon request to a separate trial, when he individually would have been permitted to exercise the right to twenty peremptory challenges, but not having asked to sever, and having consented to the joint trial, the defense only had the right to the exercise of said number of challenges without regard to the number of persons on trial as defendants. The law only intends to permit the exercise of said number of challenges for the defense on a single trial in a felony prosecution. *U. S.* v. *Hall,* 10 L. R. A. 323; *People* v. *Thayer,* 1 Parker, C. R. 595; *State* v. *Wolf,* 112 Ia. 458; *Cochran* v. *U. S.,* 77 C. C. A. 432; *State* v. *MacQueen,* 69 N. J. Law, 522.

It is next complained that the court erred in the admission of incompetent testimony. This contention is without merit however. It is true, J. A. Green, was permitted to testify that J. A. Osborne was a party to a suit instituted by the *State of Tennessee* v. *Cissna* and others in the chancery court, but the appellant had already introduced in evidence the record of said cause showing that fact.

(2) Neither did the court err in allowing said witness, Green, to testify about the true boundary line between the States of Tennessee and Arkansas, from the copy of the map produced by him in evidence. He stated

that he had formerly made a survey of the island to determine the boundary line and had made a map thereof and that the copy of the map introduced in evidence, and referred to in his testimony, was a photographic copy of the original map made by him and which had been compared and was known by him to be correct.

Curtis. Little, the clerk of Mississippi County testified that he had used the field notes of the section and township which were taken from the photographic plat book of the original surveys made by the government. These books were furnished to the clerks of the counties by the State Land Commissioner's office, with the proper certificates attached.

No witness disputed the correctness or accuracy of either the map or field notes and the court committed no error in permitting the introduction of this testimony. *Sellers v. State,* 93 Ark. 313; *Hankins v. State,* 103 Ark. 28; *Russell v. State,* 97 Ark. 92. See also, *Hall v. Conn. Mutual Life Ins. Co.,* 79 N. W. 497; *Mincke v. Skinner,* 44 Mo. 92; *Shook v. Pate,* 50 Ala. 91.

(3) Neither was error committed in allowing witnesses to testify that they heard Burt Spring and a woman call, "Oh! Mr. Dave, Mr. Dave!" several times immediately after the shooting began. These exclamations were a part of the transaction and occurrence, being made at the time and competent and admissible as part of the *res gestae.*

(4) It is insisted that the court erred in refusing appellant's requested instruction embodying the legal principles as announced in his requested instruction numbered 4 and in giving instruction numbered 1, as follows: "On the question of venue * * * you are instructed that the boundary line between the State of Arkansas and the State of Tennessee in the vicinity of the alleged crime is the middle of the main channel of the Mississippi river as the same existed on the 16th day of June, 1836, the date of the admission of the State of Arkansas, and by the middle line of the main channel of the Mississippi river, is meant the equi-distant point in the main channel of said river between the well defined banks on either

shore at said time, and all the water and lands which may now occupy the space between the middle line as same then existed, and the Arkansas shore as same now exists, is within the jurisdiction of the Osceola District of Mississippi County, Arkansas.''

Said instruction numbered 4 reads: ''Long acquiescence by one State in the possession of territory by another and in the exercise of sovereignty and dominion over it, is conclusive of the title and rightful authority of the latter State. Therefore, if you find from the evidence in this case that the State of Tennessee for more than thirty years exercised sole and exclusive jurisdiction, sovereignty and dominion over the place where the alleged crime was committed, and that the State of Arkansas has during that time acquiesced in the exercise of jurisdiction over the same, then the State of Tennessee has sole and exclusive jurisdiction over the territory where said crime was alleged to have been committed, you will return a verdict of not guilty.''

The court in its said instruction numbered 1, also called attention to the testimony adduced relating to the existence of a civil district of Tipton County, Tenn., upon Island 37, the establishment of polling places and holding elections thereon, under the laws of said State, the assessment and collection of taxes upon real and personal property and the exercise of jurisdiction by the courts of said county of Tennessee in civil and criminal proceedings against persons and property thereon, as well as testimony of the failure of the constituted authorities of Mississippi county, Arkansas, to exercise jurisdiction thereon and continued, ''This testimony is competent and is to be considered by you, together with all the other facts and circumstances in proof bearing upon this question of jurisdiction, but if you find from a preponderance of the evidence that the alleged crime was committed north of the middle line of the main channel of the Mississippi river, as it existed on the 16th day of June, 1836, at said place, the Osceola District of Mississippi County, Arkansas, has jurisdiction in this case, notwithstanding the exercise of the jurisdiction of

the State of Tennessee thereon, and notwithstanding the failure of the legally constituted authorities of Mississippi County, Arkansas, to exercise jurisdiction over said territory heretofore."

No mention was made of the law of Congress authorizing it nor the statutes of Arkansas authorizing and permitting reciprocal and extended jurisdiction over offenses committed upon the Mississippi river to the west bank thereof by Tennessee and the eastern bank by the State of Arkansas.

In *Kinnanne* v. *State,* 106 Ark. 286, this court approved an instruction relative to the boundary line between the States of Arkansas and Tennessee, declaring the law in effect as given in said instruction numbered one and quoted in the opinion, the holding and declaration of the Supreme Court of the State of Tennessee, in *Tennessee* v. *Muncie Pulp Co.,* 119 Tenn. 47, to like effect, recognizing the boundary between the states to be as declared by the Supreme Court of Arkansas, and no error was committed in the refusal of the said requested instruction numbered 4 and the others of like kind, for the State of Tennessee is making no claim of title herein to the territory upon which the offense was shown to have been committed, and as held in *Tenn.* v. *Muncie Pulp Co.,* *supra,* the states having agreed upon the true and correct line separating their territory as announced in said instruction numbered 1, others can not be heard to complain.

It is finally strongly urged that the testimony is not sufficient to support the verdict either as to the venue or the commission of the crime. The indictment charges the appellant, along with others, with conspiracy to kill and murder Sam Mauldin, the sheriff of Mississippi County, and the instructions presented the questions at issue to the jury, requiring them to find before convicting appellant that Burt Spring, who fired the shot, was guilty of such offense. It is true there is no testimony that appellant did anything on the night of the raid of the Andy Crum place and the killing of the sheriff, except to come out of his room in his night clothes after the shooting be-

gan and some one hallooed for him, but he was with diffi-
culty kept from immediately going back into the room
filled with loaded weapons, the officer having to threaten
to shoot him with a shot gun presented, to keep him from
doing so. He also laughed when he came into the pres-
ence of the sheriff who lay dying upon the ground, mani-
festing a reckless and wanton disposition in keeping with
the unlawful business conducted by him and his asso-
ciates and in accord with the many conversations and
threats indulged in by them against the Arkansas officers,
if any attempts were made for their arrest for their open
violations of the law.

(5-6)    We think the conduct of the appellant and the
others in charge of the Andy Crum place, with the threats
and statements shown to have been made by them, suffi-
cient to show an unlawful conspiracy to resist the Arkan-
sas officers and kill the sheriff upon an attempt to arrest
them. Conspiracies are often difficult to prove by direct
testimony and rarely can any express understanding or
agreement be shown, and the law does not require that it
shall be. Large latitude is allowed, necessarily, in proof
of a conspiracy, and the jury should be permitted to have
before them all the facts which will enable them to come
to a correct conclusion. Much discretion is left to the
trial court in the admission of testimony tending to es-
tablish the fact and if all the evidence shows that a con-
spiracy actually existed, it is not material whether the
conspiracy is established before or after the detailing
in evidence of the acts and declarations of the conspira-
tors. *Easter* v. *State,* 96 Ark. 629, 132 S. W. 924; *Parker*
v. *State,* 98 Ark. 575; *Chapline* v. *State,* 77 Ark. 444.

In the last cited case, the court quoted from *Can-*
*trell* v. *State,* 174 S. W. 521, 117 Ark. 233, the following:
"The rule in such cases is well defined, and has been an-
nounced in a number of decisions of this court. The proof
of such conspiracy is another of those preliminary ques-
tions to be passed upon by the court, and where evidence is
offered which is sufficient to make a *prima facie* showing
of the existence of such conspiracy, then all the acts and

declarations of each conspirator during the progress of the conspiracy are admissible against his co-conspirators. It is not often that these conspiracies can be shown by express agreement. Their existence is more often shown by the proof of circumstances, the concurrence of which leads one to believe that the parties are acting from a common unlawful motive.''

The undisputed testimony shows that the sheriff was killed by Burt Spring, the keeper of the gambling house at the Andy Crum place, which was under the control of Dave Hearne during the absence of the proprietor, while he was attempting to make arrests for violations of the law by these offenders, and the testimony is sufficient to show, as the jury found, that appellant, Spring and some of the others had conspired to resist such arrest, to the killing of the officers upon any attempt to take them. It was strongly contended that Burt Spring, who died from the wounds inflicted in the raid, had no knowledge or information that an attempt was being made to arrest him and that he had the right to protect himself and his house from those who were attempting to force an entrance and shooting at him. The testimony is in conflict upon this point but it is not disputed that before the shot was fired that killed the sheriff, Burt Spring had been told by the negro who was trying to push the door open, in order to protect himself from being shot while doing so, ''Don't shoot, Burt, don't shoot these white men, these officers and soldiers, they won't hurt you, and if you make fire, you are ruined,'' and notwithstanding this, after the door was forced open, he continued shooting until the sheriff was killed.

(7)   The testimony all shows that the place was a notorious dive operated in open defiance of the laws of Arkansas; that those in charge knew that it was regarded as in Arkansas territory and in Mississippi County by the officials of that county and that they anticipated a raid by the Arkansas officers and expressed themselves as not only prepared for but determined to resist it. Under these circumstances the evidence is sufficient to warrant the jury's verdict that Burt Spring knew that he

was resisting arrest by the officers and not attempting to defend himself against a deadly assault from an unknown assailant.

The testimony of the witnesses who made the survey and determined the boundary line between the two states was undisputed that the Andy Crum place, where the killing occurred, was on a certain part of section of land in Mississippi County, Ark., except as the testimony of the exercise of dominion and jurisdiction by the State of Tennessee over said Island No. 37, upon which the Crum place was situated, tended to refute it. The jury were properly instructed as to the venue, and the testimony is sufficient to support the finding that the offense was committed within Mississippi County, Arkansas.

Finding no prejudicial error in the record, the judgment is affirmed.