GUREIN *v.* STATE.

4404                                        193 S. W. 2d 997

Opinion delivered April 15, 1946.

Rehearing denied April 13, 1946.

*Claude F. Cooper, T. J. Crowder* and *W. Leon Smith,* for appellant.

*Guy E. Williams,* Attorney General, and *Earl N. Williams,* Assistant Attorney General, for appellee.

*Madison K. Moran, amici curiae.*

SMITH, J. Appellants were jointly tried upon an information the material portions of which will be copied, and were found guilty, and each given a sentence of one

year in the penitentiary, and from those judgments is this appeal. The information charges the violation of Act 193, of the Acts of 1943, page 412, alleged to have been committed as follows: "'The said defendants on the 15th day of September, 1945, in the Chickasawba District of Mississippi County, Arkansas, did unlawfully and with violence, force and threats prevent and/or attempt to prevent A. L. Cobb from engaging in the vocation of driving a bus, against the peace and dignity of the State of Arkansas.''

Before the trial began objections were filed to the arraignment and trial of appellants, which motion, in effect, challenged the constitutionality of the act, for the alleged violation of which they were put on trial. Without waiving the objection, it was conceded that the constitutionality of the act was settled by the opinion in the case of *Smith and Brown* v. *State,* 207 Ark. 104, 179 S. W. 2d 185.

Objection was made to a trial before the petit jury, which had just been impaneled, on account of the report of the grand jury read in open court, and in their presence. This report recited that the grand jury had been in session only one day, and had examined no witnesses, and had found no indictments, but had inspected the courthouse and jail, and made a report on the condition of those institutions.

This report recited that: "This grand jury has had its attention called and has discussed the matter of frequent disturbances and the commission of misdemeanors as an outgrowth of union organization or strikes and find that frequently there are assaults and disturbances caused, such as rocks being thrown through windows or into crowded buses. We wish to recommend to the sheriff of this county that he make every effort to see that every such violation is investigated and the wrongdoer arrested and brought to trial.''

This report made no reference to these appellants or any of them, and it does not appear that in impaneling the jury which tried appellants, any inquiry was made as

to whether any prejudice had been engendered by hearing the report read.

A demurrer to the information was filed upon the ground that the "defendants are not reasonably apprized of what offense, if any, they stand charged." The basis of the demurrer is that the information charges disjunctively and not conjunctively the commission of the separate offenses of preventing and attempting to prevent a person from engaging in a lawful occupation. Another objection to the information is that it was not alleged that Cobb was prevented from engaging in a lawful vocation.

Answering the last objection first, it may be said that the information does charge that the appellants "did unlawfully and with violence, force and threats prevent and/or attempt to prevent A. L. Cobb from engaging in the vocation of driving a bus." Driving a bus is, of course, a lawful occupation, and alleging it to be so would be merely to state an obvious fact of which judicial notice may be taken.

A more serious question is that the information alleged that the defendants did "prevent and/or attempt to prevent" Cobb from engaging in a lawful vocation. Section 1, of Act 193, provides that: "It shall be unlawful for any person by the use of force or violence, or threat of the use of force or violence, to prevent or attempt to prevent any person from engaging in any lawful vocation within this state."

It is therefore unlawful to prevent, or to attempt to prevent, any person by force or violence, or threats, from engaging in a lawful vocation, and inasmuch as the offense might be committed either by preventing, or by attempting to prevent a person from engaging in a lawful vocation, it was erroneous to charge these offenses disjunctively, although it is conceded that the offenses could have been properly charged conjunctively. The case of *Trout* v. *State*, 177 Ark. 1029, 9 S. W. 2d 237, is cited to support this contention, it being there stated that the general rule is that where a statute makes it a crime to

do any one of several things mentioned disjunctively, all of which are punished alike, the whole may be charged conjunctively, as a single offense, but that disjunctive allegations render a judgment of conviction invalid, for the reason that the accused is entitled to know certainly with what offense he is charged and to have the offense so charged that, upon acquittal or conviction, he may plead the same in bar of a subsequent prosecution for the same offense and establish his plea by the production of the former record.

Since the rendition of that opinion, there was adopted by the electors at the 1936* general election, Initiated Act No. III, entitled: "An Act to Amend, Modify and Improve Judicial Procedure, and the Criminal Law, and for Other Purposes." This act made numerous changes in the pleadings and procedure previously prevailing in the trial of criminal cases. Section 22 of that act entitled, "Contents of Indictments," provides in the last paragraph of that section that: "The State, upon request of the defendant, shall file a bill of particulars, setting out the act or acts upon which it relies for conviction." If therefore the defendants had been of the opinion that the information was uncertain as to the offense charged, they had the right to request a bill of particulars to advise whether they were charged with preventing, or only with attempting to prevent a person from doing a lawful act. This they did not do; had they done so, the objection as to the indefiniteness could have been met by the simple expedient of striking out the word "or" appearing in the phrase "and/or."

Numerous cases are cited criticizing the use of this phrase "and/or" in either civil or criminal pleadings, the most temperate of the criticisms being that it is slovenly pleading. But the use of this phrase, which we too condemn, does not so far render the information meaningless as to require us to sustain a motion filed in arrest of the judgment upon the ground that the information did not charge a public offense. It was held in

---

* Acts 1937, p. 1384.

the case of *Williams* v. *State*, 99 Ark. 149, 137 S. W. 927, Ann. Cas. 1913A, 1056, that: "To carry out the general purpose and intent of a statute, either civil or criminal, the words 'and' and 'or' are convertible." The holding in the case of *Clark* v. *State*, 155 Ark. 16, 243 S. W. 865, is to the same effect. Having failed to ask for a bill of particulars, we think the right was waived to question the sufficiency of the information, inasmuch as it avers that appellants violated Act 193 by preventing and attempting to prevent Cobb from following a lawful vocation.

The testimony developed the fact that appellants were on strike against their former employer, the Blytheville Coach Lines, engaged in operating passenger busses on and along the streets of the city of Blytheville. Their right to strike is not involved and is not questioned. They could work or not as they pleased. The question that is involved is their right to prevent another person, who does wish to work, by engaging in a lawful vocation, from doing so, by threats or violence, and Act 193 declares they do not have that right, and makes the doing or the attempt to do so a felony, and as has already been said, we held this legislation was constitutional in the case of *Smith and Brown* v. *State, supra.*

The point most strongly relied upon for the reversal of the judgment of conviction is that the testimony is insufficient to show a violation of Act 193. The determination of this question will require a review of the testimony at some length, but in its determination we must give the testimony tending to support the verdict its highest probative value, this being the applicable rule in all cases, civil or criminal, where the sufficiency of the testimony to support the jury's verdict is raised.

There is no question but that Cobb was severely beaten, the particulars of which will presently be stated. Now beating Cobb was, of course, a violation of the law, but did not constitute a violation of Act 193, unless it was done in preventing or attempting to prevent Cobb from

following a lawful vocation. Does the testimony show that this was done?

Cobb was assaulted shortly after the noon hour on Saturday, September 15, 1945. He was first employed and entered service as a bus driver on the morning of that day. None of the strikers knew him or had any previous grievance against him. It was shown that all five of the appellants had at one time or another, and from time to time, walked a "picket line," which was being maintained in front of the bus station from which busses departed and to which they returned in transporting passengers. The route of the bus line extended to the city limits, where the busses would back up and turn around and return through the city.

Cobb testified that in making what was probably his second round trip, he drove the bus to a street corner where Bennie Overton, one of the appellants, was standing as if he intended to board the bus, and Overton, pointing a finger, said to Cobb, "You had better get off that bus." A block or two further down the street Tapps and Gurein, two other appellants, got on the bus and rode to the end of the bus route, and while Cobb was leaning over cleaning his change box, all the passengers got off except Tapps and Gurein, who came up behind him, grabbed him by his legs and dragged him out of the car. Oakley, Collins and Overton, the three other appellants, were standing on the outside. Cobb was thrown to the ground, and all five men began striking, kicking and stamping him. Both his eyes were blackened, his face was bleeding, and one of his ribs was broken, and he testified that he was sore all over. As he was dragged from the bus, some of his nickels and dimes were scattered over the floor of the bus. He further testified that all five of the defendants assaulted, beat and kicked him, and continued to do so until a Mr. Huey compelled them to desist.

Tapps, after boarding the bus, did not get off at the corner of the street where he lived, and explained this failure by saying that he just got to talking and was in

no hurry, and rode to the end of the bus route. Collins and Oakley went to the scene of the difficulty in a taxi, but testified that they were not present when the difficulty occurred, and had no part in it. The assault was terminated by the intervention of J. O. Huey, an elderly gentleman, whose home is near the place where the bus makes its turn-around. While he was standing there appellant Bennie Overton, accompanied by two men he did not know, passed him and Overton called him aside and said to him, "If you see anything, you don't see it." He did not know how the altercation started, but testified that after the bus stopped he looked up and saw some fellows had grabbed the bus driver and were dragging him out of the door of the bus and five got on him, and he said, "Well we can't stand for that, five on one," and he asked them to stop. He called his son who lived near by, but did not appear until the affray was over. But his grandson, who was 14 years old, did appear and one of the men made a motion as if to strike the boy, and Mr. Huey said, "Don't do that, but come on if that is what you are looking for, but I am not going to stand for this." The witness was asked, "Mr. Huey, are these the five men (pointing to the five defendants)?" And he answered, "Yes, sir." He was asked, "How many of these five men were engaged in the assault?" He answered, "Them five." He was asked, "All five?" and he answered, "Yes, sir, they had him stretched out really going to it, pouring it on him."

Mr. Huey's grandson substantially corroborated the testimony of his grandfather, and when asked, "How many of the five men were in that fight," answered, "All of them." Son Fisher, a 15-year-old boy, testified to substantially the same effect, except that he saw only four men beating Cobb, and Collins was not one of them.

Appellants stress the point that no proof of threats was shown. This is one method by which Act 193 might be violated, but it is not required to show its violation that threats were made. If the jury found, and the testimony would support the finding, that a conspiracy existed to prevent Cobb from working, it might further have

been reasonably inferred and found that appellants had agreed upon what they would do and proceeded to do it without preliminaries, or any apportionment of the respective parts they would play.

Appellants all denied that they made any attempt to keep Cobb from working, and that the altercation which occurred was a mere fight between Cobb and Gurein, which began when Cobb, without provocation and without anything having been said, kicked Gurein, who fell down the steps of the bus.

Tapps testified that it was against the rules of the bus company to fight on the bus, and for that reason he pushed Cobb off the bus when Cobb started the fighting. When asked why he pushed Cobb off the bus to enforce the rule of the company against fighting on the bus, he did not stop Gurein from fighting, he answered, "It didn't make me no difference, he needed it." Question: "He needed it when he started driving the bus?" Answer: "He knows he did too."

As to the other three appellants, proof of an alibi was offered, this being to the effect that they were not present when the affray began, nor until after its conclusion, and that they had no part in it, and made no attempt whatever to prevent Cobb from pursuing his employment. They were corroborated by the testimony of a witness referred to as Clara, who was Overton's cousin, and who lived in a small house near the scene of the affray with her nephew and sister. She testified that Collins, Overton and Oakley were in her kitchen eating dinner when the affray began, and they heard the commotion and went to see what the trouble was about, and they saw two men fighting, but they did not know how the trouble started, or what the men were fighting about. Oakley testified that Collins invited him to dinner at Clara's, but Collins testified that he had not been personally acquainted with Clara previously.

As appears from what has been said, this testimony is in sharp conflict with that offered by the state, and it was the province of the jury to determine what testimony

should be believed. Evidently the jury did not believe, but disregarded, this testimony, tending to prove the alibi, and under the facts stated, we cannot say that it was arbitrary to have done so. If the testimony on the part of the state is true, and its truth was of course a question for the jury, the conclusion is warranted that appellants assaulted Cobb because they were striking while he was working, and that it was their purpose and intention to prevent him from doing so. On his cross-examination Tapps testified as follows: ''(Cobb) being a scab driver was the cause of the trouble? A. Yes, sir. Q. That is the cause of the whole trouble? A. I suppose it was.''

The cause was submitted to the jury under instructions of which no complaint is made.

Cobb was taken by his employer off the bus and put to work in the bus company's repair shop, and some days after the affray one of applellants, while walking the picket line with some others, pointed his finger at Cobb and said, ''Look at him, he looks like a nigger.'' This incident, occurring after the affray, would ordinarily not have been competent, but in view of the defense interposed that appellants made no attempt by threats or otherwise to prevent Cobb from working, was admissible to refute that contention, and to show that appellants had been in fact endeavoring to keep Cobb from working. However, if admitting this testimony was erroneous, the error was invited. On his cross-examination Cobb was asked: ''Q. Up to this good minute they haven't said a word to you about anything, that they never opened their mouths to you at any time on that bus or after?'' Thereafter on his redirect examination, the statement objected to was elicited.

Tapps on his cross-examination testified, ''After I quit I didn't like him. He was still scabbing,'' (by which it was meant that Cobb had taken the place of an employee who was out on strike). Tapps admitted further that ''We asked him (Cobb) why he didn't come on out of there and act like a human?'' This testimony, while objected to, was nevertheless competent to show that ap-

pellants were in fact endeavoring to prevent Cobb from continuing his employment, the culmination of that purpose being the assault upon him.

Objection was also made, and exception saved, to the action of the court in permitting Mr. Huey to testify that Bennie Overton said to him, ''If you see anything you don't see it.'' In admitting this testimony and in overruling the objection made to it, the trial judge said, ''The jury will be told that such is not admissible against any of the defendants not present at the time this conversation occurred, for any purpose, but only against the one there at the time.'' The significance of this remark cannot be mistaken. It could mean only that something was about to happen which Huey was not expected to see. The testimony was clearly competent and the only error committed by the court in admitting it was to limit its consideration against the appellant who made the remark. The law is that if a conspiracy exists to do an unlawful act, any and all acts of any one of the conspirators in furtherance of the conspiracy is admissible against all persons shown to be parties to the conspiracy.

In the case of *Butt* v. *State,* 81 Ark. 173, 98 S. W. 723, 118 Am. St. Rep. 42, it was said that ''when a conspiracy has been shown, then the acts and declarations of one conspirator in furtherance of the common design may be shown as evidence against his associates.'' A headnote in that case reads as follows: ''If the acts of two or more persons were aimed toward the accomplishment of some unlawful object, each doing a part, so that their acts, though apparently independent, were in fact connected, indicating a closeness of personal association, and a concurrence of sentiment, a conspiracy may be inferred, though no actual meeting among them to concert means is proved.'' See, also *Hearne* v. *State,* 121 Ark. 460, 181 S. W. 291; *Sims* v. *State,* 131 Ark. 185, 198 S. W. 883; *Housley* v. *State,* 143 Ark. 315, 220 S. W. 40; and *Moss and Clark* v. *State,* 194 Ark. 524, 108 S. W. 2d 782.

We conclude that the testimony supports the verdict of the jury, and as no prejudicial error appears, the judgment must be affirmed, and it is so ordered.

GRIFFIN SMITH, Chief Justice, and MINOR W. MILL-WEE, J., concur in part and dissent in part. ROBINS, J., dissents.

The Chief Justice concurs in so much of the opinion as affirms the judgment as to Gurein and Tapps, but dissents from the holding that there was substantial testimony showing violation of Act 193 by Collins, Overton and Oakley.

ROBINS, J., dissenting. We are dealing here with a criminal statute. It denounces the use of violence, or the threat thereof, to prevent "any person from engaging in any lawful vocation within this state." It does not make felonious such violence or a threat thereof merely because the person committing the violence or making the threat is a striker and the one assaulted or threatened is a strikebreaker; but, before the law is violated, the purpose of such violence or of the threat thereof must be to prevent some person from engaging in his "lawful vocation."

As I read the record in this case there is no *proof* that the purpose of the violence was to cause Cobb, the prosecuting witness, to desist from his work. In order to find appellants guilty the jury must have presumed that the acts of violence done by appellants were committed with intent to prevent Cobb from working. But it could as well have been presumed that the assault on Cobb was the result of malice toward him because of his strikebreaking activities or enmity toward him for some other reason; and, if such was the motive, the acts of appellants amounted only to an unlawful assault and not to a violation of the statute invoked by the state. As was said by Judge WOOD in *Martin* v. *State,* 97 Ark. 212, 133 S. W. 598: "Between conflicting presumptions, that which is in favor of the innocence of the accused prevails."

In a prosecution for a felony the state could be required to prove all the material elements of the crime charged, and, in my opinion, this was not done in the instant case.