COLE, JONES AND BEAN *v.* STATE.

4414                              196 S. W. 2d 582

Opinion delivered October 7, 1946.

434

*Lindsey P. Walden, Elmer Schoggen,* and *Ross Robley,* for appellants.

*Guy E. Williams,* Attorney General, and *Earl N. Williams, Assistant Attorney General,* for appellee.

GRIFFIN SMITH, Chief Justice. Disregarding other matters complained of by appellants, we agree that the judgments must be reversed because incompetent evidence was admitted.

Of 117 union laborers under contract with Southern Cotton Oil Company in Little Rock, 112 went out on strike December 17, 1945.[1] The disgruntled former workers established picket lines and had a tent erected and maintained near the Company's property, but not on Company lands.

---

[1] The record is not entirely accurate as to numbers, but this is unimportant. For example, on page 17 of appellants' brief it is stated that "Otha Williams, Willie Brown, Elvy Washington Williams, and Willie Jackson did not join the strikers." Following this it is said: "For the three shifts approximately 117 men were employed. Of these, six Negroes and some white [men] did not go out on strike. One or two of the 'whites' could have been classed as laborers, 'one in particular.' Of the 117 laboring employes, 112 [struck]."

It is clearly inferable—in fact, there is direct proof—that relatonship between the strikers and those who remained at work was far from amicable. December 26th Walter Campbell and Otha Williams clashed. In consequence Williams spent seventeen days in a hospital recuperating from injuries inflicted by Campbell before Williams succeeded in drawing a pocket knife and opening a blade with his teeth. The defensive measures employed by Williams resulted in Campbell's death, although Williams says that when he left the scene after cutting Campbell, his assailant was still standing. A grand jury, upon investigation, determined that the facts reflected justifiable homicide, and declined to indict Williams.

Acting upon the theory that acts of violence intended to prevent non-strikers from working had been engaged in, and that Roy Cole, Louis Jones, and Jesse Bean (colored) had been participants, indictments were returned against them, essence of which is that *"by the use of force and violence"*, they prevented Williams from working for the Cotton Oil Company. The disorder complained of occurred December 26th.

The indictment is predicated upon Act 193, which became a law without the Governor's signature March 11, 1943. See *Smith and Brown* v. *State,* 207 Ark. 106, 179 S. W. 2d 185; *Gurein* [and others] v. *State,* 209 Ark. 1082, 193 S. W. 2d 997.

In the Gurein case one Justice dissented in respect of affirmance as to any of the defendants, while two members of the Court thought the evidence sufficient to convict Gurein and Tapps, but insufficient as to three other defendants. In that case the information asserted violation of Act 193, and alleged that the defendants unlawfully and with malice, force and threats "prevented and/or attempted to prevent" A. L. Cobb from engaging in the vocation of driving a bus.

Affirmance of the Gurein and Tapps judgments and approval of judgments against the other defendants, appear to have rested upon construction given Initiated

Act No. 3, adopted in 1936. The Gurein opinion says that if the defendants believed charges in the information were uncertain, "they had the right to request a bill of particulars to advise them whether they were charged with *preventing,* or only with *attempting to prevent,* [2] a person from doing a lawful act." It was held that if objection had been made to the so-called "indefiniteness" prior to trial, the deficiency could have been met "by the simple expedient of striking out the word 'or' appearing in the phrase 'and/or' ".

In the case at bar we are dealing with an indictment, not an information. Here charges were made by a grand jury, and it confined accusation to acts of the three defendants who "by the use of force and violence" are alleged to have prevented Williams, (and he is the only one mentioned) from engaging in work as a laborer.

One of the first motions by defendants was to quash the indictment "because it is so vague and indefinite that they are not advised of the charges against them".

Treating the Act as constitutional—and it has been so held in two cases—the motion to quash was properly overruled because the indictment alleged that the accused, by use of force and violence, prevented Williams from working.

Defendants argue the Act is void because provisions of Sec. 4 are made cumulative of other existing articles of the penal code upon the same subject. Perhaps the answer is that no other article of the code deals with the identical subject and undertakes to cover labor strife (accompanied by violence and threats) as a matter distinct from prior classifications.

Denial of the motion to quash, however, though legally proper—did not authorize introduction of evidence that a crime denounced by the Act (the commission of which was a transaction separate from the use of force or volence) had been committed—for example, that the three defendants, or either of them, had by threats, unaccompanied by force or violence, prevented

[2] Italics supplied.

Williams from working. At trial it was sought by those who are now appealing to have such testimony excluded. This motion was denied because the Court thought (as it said in refusing to give defendants' requested Instructon No. 11), "a threat is an element of violence".

So, it will be seen, the trial was conducted upon the assumption that, although the indictment did not allege threats were made, evidence of threats was admissible to prove the use of force and violence—because, as the Judge stated, "a threat is an element of violence". Certainly a threat of bodily harm or material damage or serious inconvenence may, in certain circumstances, become an element of violence; but the nature of the attempted coercion, the situation of the parties and the subject-matter causing disputation—these and other factors would ordinarily enter into the transaction and affect the event.

Section 2 of Act 193 undertakes to define an unlawful assemblage. It is made unlawful for any person, "acting in concert with one or more other persons, to assemble at or near any place where a 'labor dispute' exists and by force or violence prevent or attempt to prevent any person from engaging in any lawful vocation, [and it shall be unlawful] for any person acting either by himself, or as a member of any group or organization or acting in concert with one or more other persons, to promote, encourage, or aid in any such unlawful assemblage".

Trial of the defendants preceeded as though there had been an admission that the men who composed the picketing group constituted an unlawful assemblage. There is no such admission. Proof is not satisfactory that the strikers bore a direct grievance against any but Williams. Williams was attacked by Campbell and Campbell paid the penalty of life for his rashness. No one testified that others struck or attempted to strike Williams. On this point the version given by Willie Brown[3] is informative. He was among the number who

---

[3] This witness (Willie Brown) was sentenced to the penitentiary for killing a white man. He was "furloughed" in 1940.

did not join the strike, but saw Cole, Jones, and Bean "walking the picket line". The day Williams killed Campbell, Cole came up after the fight. Brown heard Jones call to Williams. Brown testified that "Louis [Jones] gave a signal and said, 'all right, boys'. Then they flocked around like blackbirds from all directions and Campbell struck Williams with a stick. Roy Cole [one of the defendants] told me to go ahead, as they were not after me".

Charlie Owens testified that Bean told him the morning of December 26th not to cross the picket line, adding, "If anything happens, it will just happen". Owens was a Company employe who did not strike.

Brown testified that after the fight started, Cole came up "with a club". Willie Johnson saw Cole and Bean where the fight occurred, after Campbell had been cut; but neither participated in the engagement. He didn't see Jones there. A man named Robert Brooks, however, "grabbed" Johnson.

Elvy Williams testified that Otha Williams and Willie Brown "started out" with others, went back and unloaded a truck, then joined a group. Looking across the street he saw Bean, Bishop, Jackson, Brooks and Campbell. An unknown person threatened Otha Williams. He did not see any of the defendants strike Otha Williams, or use violence. His attention was first attracted when Willie Johnson yelled that some one had hit him. "This man" (he didn't know who) came with a club.

Otha Williams, after he and Willie Brown had unloaded the seed, crossed the railroad They were going west. Across the street Williams saw some of the men who were on strike, including Jones, Jackson, Bean, and Cole. Jones called, saying he wanted to talk. Williams replied that he was in a hurry. Jones insisted on seeing him at that time, but Williams walked across the track and was near a store when Campbell struck him in the back of the head, using a stick. It was then that Williams drew his knife, opened it with his teeth, and began cutting. On cross-examination he was asked:

"So far as you know, neither of the three defendants struck you? A. If they did I didn't know it. If they hit me I didn't know it."

Bishop Jackson (under another indictment on a charge of using violence, but not yet tried) testified that the morning of December 26th he went to the headquarters tent used by the strikers and saw Bean, Jones, and others there. He heard "someone" say "they" were going to talk to a boy who was working and if he didn't talk right they would give him a whipping. In the evening he went with Campbell to the foot of Ninth street and together they approached "the boys" who were doing picket duty. He saw Jones. Bean had been there, but had left. Cole came up. He had a stick. "The boys from the mill started to cross the street to go to the street car. Just then one of the strikers told them they wanted to talk to them. One said he didn't have time and the boys from the mill kept on walking". This witness did not know what the strikers did because, when Williams and Campbell began fighting, he caught a street car to go home. On cross-examination he asserted that neither of the defendants assaulted anyone or used violence. All of the witnesses were introduced by the State.

The State argues that "this threat which Owens testified to was a part of the whole picture and was a part of the conspiracy, and under the holding in *Gurein v. State* . . . this type of testimony was competent."

Quoting from the Gurein case, the State emphasizes that part of the opinion that says " . . . if a conspiracy exists to do an unlawful act, any and all acts of any one of the conspirators in furtherance of the conspiracy is admissible against all person shown to be parties to the conspiracy". It is then said in the State's brief: "The facts in that case appear to us to be identical to those in the case at bar".

If it be assumed that, in practical effect, facts here and in the Gurein case were similar, still we have not disposed of differences between the information and the indictment. In the Gurein case it was alleged that

Act 193 had been violated, and that charge included all provisions—embracing, of course, Sec. 2. Here there was no such allegation. A part of Sec. 1 alone is involved; and yet, in order to prove that the three men whom the State's witnesses assert took no part in the affray between Campbell and Williams (transactions said to have occurred during the morning, effect of which could have pointed only to a plan of action in concert, or indicated conspiracy) was admitted over the defendants' objections. Timely exceptions were made and brought forward in the motion for a new trial.

The nearest approach to actual participation by either Cole, Jones, or Bean, occurred when Cole, who was said to be carrying a stick, came upon the scene as Campbell assailed Williams and lost his life. At least one of the witnesses referred to Cole's club as a walking stick. But whatever it was, no use was made of its potential as a weapon; nor can it be said that the mere presence of a man in such a gathering, whether laborer or employer, brands him as a felon on that ground alone.

It must be borne in mind that the workers engaged on both sides—those who struck and those who refused to do so—included men whose manners in expressing their likes and dislikes, whose ordinary conversations, and whose so-called "threats" are not necessarily on a parity with workers whose opportunity for higher standards has been exercised. It has often been said that the raw, rough, and ready language of an uncouth pick wielder, in conversation with an associate, might mean one thing to the man at a desk and quite a different thing to a menial of equal classification and having similar habits. What would insult or frighten a particular individual might not cause a ripple of apprehension in the man who understood the mental attitude of a person inured to physical adversity.

The thought is expressed by Lord Halifax as a member of the British government prior to 1933.[4] In welcoming labor into politics and national affairs he said: "Many of the newcomers are disorderly, many seem essentially violent minded. Yet our debates are richer for their presence. Not all of us are as near to the sufferings of the working classes as they are. They bring (however misguided some may be in their opinions, and however violent they may be in publicly expressing them) home to the House of Commons the gravity of our social problems and the importance of getting fundamental things right".

It is the duty of the General Assembly to declare the State's public policy and define its police powers. Courts interpret and construe. In the instant case we are dealing with a statute that invokes punishment as for a felony where the same conduct, if committed in a non-labor dispute, would be a misdemeanor—an offense as to which the guilty party might be discharged upon payment of a small fine, as compared with a possible two-year prison term.

In making this radical change the Legislature must have intended to cover the entire subject insofar as the Act went, and to have expressed its whole purpose; hence nothing would be left to intendment.

Under any reasonable construction Section 1 creates separate offenses, as does Sec. 2, and an indictment that alleges crimes covered by a part of Section 1 does not impose upon the defendant a duty to defend under Section 2 or against "threat" provisions of Sec-

[4] Lord Halifax, British Ambassador to the United States, made a *quasi* official visit to Little Rock in 1944, accompanied by Lady Halifax and attaches of the embassy; also Mr. Wood, a son, who in spite of the loss of both legs in the North African campaign, had mastered artificial limbs and paid a visit to inmates of the Veterans Hospital at Hot Springs. Included in the group were Mr. Paterson, in charge of the consulate at St. Louis, and Mrs. Paterson. Born April 16, 1881, Edward Frederick Lindley Wood has the following titles: Third Viscount Halifax of Monk Bretton, First Baron Irwin of Kirby Underdale, night of the Garter, Privy Councillor, Knight Grand Commander of the Star of India and Knight Grand Commander of the Indian Empire, and finally, His Royal Majesty's Ambassador to the United States. See "The Men Around Churchill," by Rene' Kraus, pp. 16 and 44.

tion 1. In holding that "a threat is an element of violence" the trial Court allowed too much latitude for the introduction of testimony going solely to other transactions. It follows that the judgments must be reversed and the causes remanded for a new trial or new trials.

SMITH, J. (dissenting). Why should the judgments of conviction in this case be reversed?

The constitutionality of the act under which they were convicted is not questioned, but is reaffirmed. The right of a person to refuse to work is not questioned. One who does not wish to work and refuses to do so, has the right also to solicit others to join with him in this refusal. But this right of one not to work, and to solicit others to join him in his refusal, is no more sacred than is the right of another who does wish to work to do so. As the purpose of Act 193 of the Acts of 1943 is to protect the right to work, it does not appear to me to be violative of any provision of either our own or the Federal Constitution.

Having the power to protect this right to work, it was the province of the General Assembly to determine how that power should be exercised, and to enact such legislation as was thought reasonably necessary to accomplish this lawful purpose, and it does not appear to me to be in excess of this power, or an abuse thereof, to enact that no one shall by force or violence or threats of violence prevent another from engaging in a lawful occupation.

Section 1 of this Act defines two offenses. The first is by the use of force or violence preventing any person from engaging in any lawful vocation within this state. The second offense is to prevent any person from engaging in any lawful vocation within this state by the threat of the use of force or violence for that purpose. In other words, it is unlawful to prevent one from engaging in any lawful occupation either by using force or violence or by the mere threat to use force or violence.

Proof of threats of violence was admissible for several different reasons. First, they were of themselves a

form of violence. Webster's New International Dictionary defines violence as follows: "Injury done to that which is entitled to respect, reverence, or observance; profanation; infringement; unjust force; outrage; assault. Broadly, exertion of any physical force considered with reference to its effect on another than the agent, as in effecting an entrance into a house in burglary. Sometimes, in law, the overcoming or prevention of resistance by threats of violence is held to be constructive violence."

Proof of threats was admissible to explain the purpose of the strikers and was admissible also to show the concert of action which proved the existence of a conspiracy among the strikers to prevent others not on a strike from working.

The defense was interposed that the strikers were attempting merely to persuade those employees not on a strike, to desist from working. But how could this lawful purpose be disproved except by showing what the strikers said they would do and what they did?

What means the testimony recited in the majority opinion that Campbell and others said the very afternoon when the strike terminated in riot, resulting in Campbell's death, that they were going to talk to a boy who was working, and if the boy did not talk right they were going to whip him? Why whip the boy if not to stop him from work?

Why was Williams assaulted by Campbell except to prevent Williams from working? Williams and Campbell had had no personal quarrel or altercation. If the striking men were not "after" anyone why should Willie Brown have been told by Roy Cole, one of the strikers, that they were not after him? Does not this remark explain itself, accompanied as it was by the fact that almost immediately after it was made Williams was attacked by another striker and forced to kill his assailant in his necessary self-defense, as the grand jury later found after investigating the facts? What meant the remark of

Jesse Bean, one of the strikers, and an appellant here, made to Charlie Owen, an employee who did not strike, on the morning of the day Campbell was killed, that he must not cross the picket line, as he would have been compelled to do if he went to work, and that if he did cross it and anything happened it would just happen?

What means the testimony that when Williams attempted to hurriedly leave the plant where he was working, and gave his reason for not stopping, when told to do so, that in response to a signal given by Louis Jones, one of the appellants here, the strikers came from all directions and flocked around like blackbirds? What were the strikers trying to do if not to prevent Williams and others from working, and how better could their purpose be shown than to prove what they said they were going to do before they did it.

If the undisputed testimony does not show the existence of a conspiracy to prevent Williams and others from working, is not the testimony sufficient to support the finding that a conspiracy existed to accomplish this unlawful purpose? If so, all the acts and declarations of any of the conspirators are admissible against all the other conspirators. *Gurein* v. *State*, 209 Ark. 1082, 193 S. W. 2d 997, and cases there cited.

It is not contended that the testimony is not legally sufficient to sustain the conviction. Indeed that contention could not well be made in view of the facts recited in the majority opinion.

The court gave an instruction reading as follows: ''If you believe from the evidence in this case beyond a reasonable doubt that the defendants in Pulaski county and on about the 26th day of December, 1945, willfully, unlawfully and feloniously and by the use of force and violence prevented Otha Williams from engaging in a lawful vocation, you will convict them as charged in the indictment.''

This instruction does not permit a conviction upon the mere proof that threats were made, although the Act

might have been violated in that manner, but requires the finding that appellants "by the use of force and violence prevented Otha Williams from engaging in a lawful vocation."

The undisputed evidence shows that appellants and their co-conspirators did actually prevent Williams from engaging in a lawful occupation. Williams was assaulted and all but killed and as a result of this beating he was confined in a hospital for a period of seventeen days, during all of which time he was prevented from working. He was unable to resume his work because of the injuries and wounds inflicted upon him. The evidence as to the threats was required to show why this was done, and was therefore admissible in evidence. This is true because the mere beating of Williams while a violation of the law, would not have been violation of the Act. It was essential to show why he was beaten, and proof of the threats was necessary to show that purpose.

There is no error in this record. Not only is the verdict supported by evidence legally sufficient to sustain the conviction, but it is supported by the undisputed evidence when the conduct of Campbell and his co-conspirators is interpreted in the light of the threats made before, and at the time of the assault upon Williams.

I think the judgment should be affirmed and therefore dissent from the reversal of the judgments pronounced upon the verdict.

I am authorized to say that Mr. Justice McHANEY concurs in the views here expressed.