BATES *v.* STATE.

4-7961                                                 197 S. W. 2d 45

Opinion delivered November 11, 1946.

*Elmer Schoggen* and *Ross Robley*, for appellant.

*Guy E. Williams*, Attorney General and *Arnold Adams*, Assistant Attorney General, for appellee.

GRIFFIN SMITH, Chief Justice. Christopher Bates and his wife, Daisy, are Negroes and publish a weekly newspaper in Little Rock—Arkansas State Press.

Roy Cole, Jesse Bean, and Louis Jones, strikers, were convicted March 19, 1946, under an indictment in which it was charged that " . . . by the use of force and violence they prevented Otha Williams from engaging in a lawful occupation."[1]

March 23 each defendant was sentenced to serve a year in prison. They were remanded to custody of the Sheriff with directions for "speedy transportation" to the penitentiary. At that time there was no move for a new trial, although motion was filed April 3, and overruled.

On March 29—six days after the strikers had been sentenced and five days before the Court was asked to grant a new trial—Arkansas State Press publicized the events, the attending circumstances, and made comment.

April 25 an "Attachment for Contempt of Court"[2] was issued, directing that Christopher and Daisy Bates be "taken and safely kept" until April 29, " . . . to answer to the people of Arkansas "for a contempt of court [because they had printed] false accounts" of the Cole, Bates, and Jones trial. It was asserted that the news or editorial items were calculated " . . . to influence, intimidate, impede, embarrass, and obstruct the

---

[1] See *Cole, Jones and Bean* v. *State, ante,* p. 433, 196 S. W. 2d 582.

[2] The record does not disclose a judicial order authorizing issuance of the attachment, but presumptively such order was omitted from the record through error.

Pulaski Circuit Court and other courts in the due administration of justice, and by further writing contemptuously of the Pulaski Circuit Court and the Jury and Jury Commissioners, and the presiding Judge of the First Division."

Specifically, it was complained of the headline wherein it was said: "Strikers Sentenced to Pen by Hand-Picked Jury."

In the text of the article, first paragraph, this appears: "Three strikers, who by all observation were guilty of no greater crime than walking on a picket line, were sentenced to one year in the penitentiary by a hand-picked grand jury, [sic] while a scab who killed a striker is free." And then: "The prosecution was hard-pressed to make a case until Judge Lawrence C. Auten instructed the jury that the pickets could be found guilty if they aided or assisted, or just stood idly by while violence occurred." This statement was attributed to a news report appearing in the Arkansas Gazette.

Other matters excepted to were: (a) The ninth paragraph read, "Motions to quash the indictments were overruled, . . . including protests to the fact that there were no Negroes on the jury in accordance with the law"; (b) "Appeal bonds were fixed at $2,500 each, [when] the usual bail in such cases is $1,000"; (c) Paragraph Eleven: "There can be no doubt that we will win this case when it is appealed to the Arkansas Supreme Court [3] or the Supreme Court of the United States." This statement was attributed to Lindsey Walden, an attorney who assisted in the case. Continuing the quotation from Walden, the newspaper said: "Labor has been a victim of 'fixed' juries before, and we have been able to set the verdicts aside. I have never before tried a case where a Judge and Jury were so prejudiced and committed so many reversible errors."

The petitioners were arrested and lodged in jail. Shortly thereafter they were released on bond. When

---

[3] The judgments were reversed October 12, 1946, and the causes remanded for new trials.

arraigned each was fined $100 and sentenced to serve ten days in jail.

A Justice of this Court issued temporary *super-sedeas*. The following Monday the writ was continued pending hearing on the merits, suitable bond having been supplied.

Did the article, critical though it obviously was, tend to interfere with orderly conduct of the judiciary? A response was filed, denying a purpose to impugn the Court's integrity or to impair the law's processes. Our iniquity goes to the proposition whether, as the Supreme Court of the United States expressed it,[4] the publication created a clear and present danger to judicial administration.[5]

Whether the strikers' cases were pending when the article was written is a question of construction. The judgments were final, sentences had been pronounced, and the Sheriff had been directed to deliver his prisoners to the penitentiary warden. A maximum term of two years might have been imposed, but the jury in the exercise of its discretion did not assess the limit.

At that point in the proceeding it was possible (though highly improbable) that no motion for a new trial would be filed. In such event the Circuit Court's work was done. We think, however, (in view of the known policy employed by many lawyers of pressing for relief until all reasonable means have been exhausted) a case is pending during the time allowed for filing motion for a new trial. But it does not follow that during that time any form of newspaper comment or criticism is anathema. Those elected to office must expect, and they usually receive, approval and disapproval that alternate. A Judge, *per se,* is in no different situation from that occupied by another who undertakes to discharge legally

[4] *Bridges* v. *California,* 314 U. S. 252, 271-278, 62 S. Ct. 190, 86 L. Ed. 192, 159 A. L. R. 1346; *Pennekamp* v. *Florida,* 66 S. Ct. 1029.

[5] The case at bar should not be confused with instances where the act complained of occurs in the presence of the Court, or in its constructive presence; nor is it related to those cases where the service of process is ignored, interfered with, or the judicial machinery otherwise halted.

imposed public responsibilities. Courts are institutions wherein the State's judicial powers repose. Art. VII, § 1, Constitution of 1874.

Heretofore it has been thought that contempt proceedings in instances such as we are dealing with would be pursued only where, by a fair construction of all of the acts complained of and the status existing at a time reasonably proximate to the incident, fair minds would agree that the judicial power was being or would be impaired. The dignity of a particular individual sitting on the bench is not a matter of importance paramount to the institution our system has designated a Court. As Mr. Justice Reed of the United States Supreme Court expressed the thought in *Pennekamp* v. *State of Florida*:

"What is meant by clear and present danger to a fair administration of justice? No definition could give an answer. Certainly the criticism of the Judge's inclinations or actions in those pending non-jury proceedings could not directly affect such administration. This criticism of his actions could not affect his ability to decide the issues. Here there is only criticism of judicial action already taken, although the cases were still pending on other points or might be revived by rehearings. For such injuries, when the statements amount to defamation, a Judge has such remedy in damages for libel as do other public servants."

In a concurring opinion in the same case Mr. Justice Frankfurter said: " . . . Criticism, therefore, must not feel cramped, even criticism of the administration of criminal justice. Weak characters ought not to be judges, and the scope allowed to the press for society's sake may assume that they are not. No judge fit to be one is likely to be influenced consciously except by what he sees and hears in court and by what is judicially appropriate for his deliberations. However, judges are also human, and we know better than did our forbears how powerful is the pull of the unconscious and how treacherous the rational process. While the ramparts of reason have been found to be more fragile than the Age of Enlightenment

had supposed, the means for arousing passion and confusing judgment have been reinforced. And since judges, however stalwart, are human, the delicate task of administering justice ought not to be made unduly difficult by irresponsible print."

Although the record before us includes only matters bearing on the contempt proceedings, there is nothing to show that there was, or was not, a "hand-picked" jury in the criminal trial to which the petitioners here referred. There is a presumption in favor of integrity. Every Judge has heard the disappointed lawyer remark that his case was lost because of a "hand-picked" jury—sometimes with, but usually without, reason.

Language that probably irritated the Judge included the assertion that ". . . The prosecution was hard pressed to make a case until Judge Lawrence C. Auten instructed the jury that the pickets could be found guilty if they aided or assisted, or just stood idly by while violence occurred." As previously mentioned, the information upon which this statement rested was attributed to Arkansas Gazette. The Gazette's trial report is not in the record. In libel, slander, or contempt, one is not excused because another originated the objectionable matter or primarily initiated the conduct. A person who maintains either in motion may in fact be the offending party; nor is the quotation State Press attributes to the Gazette faculty correct, as disclosed by the Cole-Jones-Bean transcript.[6] But, as we have already said, the Court gave an incorrect instruction, (although this was mere speculation upon the part of those who made the criticism) and we know of no rule of law permitting jail sentences and contempt fines merely because a newspaper thinks some Judge has mistakenly stated the law. Such comment does not create a present danger to the administration of justice.

When on September 7, 1874, certain distinguished gentlemen subscribed to the proposition set out as Art.

[6] In that case it was held on appeal that an instruction which seemingly was the one commented on by petitioners and copied in the so-called attachment, was erroneous, calling for reversal of the judgments.

II, § 6, of the Constitution, they were not expressing new thought, but reasserted an opinion then common among men: "The liberty of the press shall forever remain inviolate. The free communication of thoughts and opinions is one of the invaluable rights of man; and all persons may freely write and publish their sentiments on all subjects, being responsible for the abuse of such right."

A distinction might be drawn between writing and publishing one's "sentiments," as the term is used in the Constitution, and in printing diatribes where public institutions charged with the administration of justice are singled out. Any arbitrary line we might attempt to draw would be subject to restrictions imposed in the Pennekamp case and others of similar import, by which we are bound. Essence is that unless the writing precipitates a clear and present danger, in consequence of which justice will be affected, recourse of the aggrieved person is prosecution for libel.

The judgments are quashed. The causes are remanded with directions to dismiss the actions.